UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PARENTS LEAGUE FOR EFFECTIVE
AUTISM SERVICES, et al.,

          Plaintiffs                    Case No. 2:08-cv-421

      v.                               Judge Graham

HELEN JONES-KELLEY, et al.,        Magistrate Judge King

          Defendants.

Memorandum Opinion and Order

This matter comes before the Court on Plaintiffs' Motion for a Temporary Restraining Order (Doc. 3 ) filed on May 2, 2008, contemporaneously with a complaint for injunctive and declaratory relief. (Doc. 2)[1].  The Court held a hearing on Plaintiff's motion on June 27, 2008.  On June 30, 2008, the Court denied the joint motion to dismiss filed by Defendants Helen Jones-Kelley and Sandra Stephenson (State Defendants). Because the Plaintiffs have established a likelihood of success on the underlying allegation that Ohio's proposed administrative rules violate federal Medicaid law, the Court grants Plaintiffs' motion.

## I.    Factual Findings

Plaintiffs are Parents League for Effective Autism Services (PLEAS), X.C., a minor and his parent, W.G., a minor and his parent, and K.W., a minor and his parent.

---

[1]    Plaintiffs filed an amended complaint for injunctive and declaratory relief on June 24, 2008 (Doc. 27).

Plaintiff PLEAS is an association of parents and families and children, including the three individual plaintiffs, who are children under the age of twenty-one with a diagnosis on the autism spectrum.  Plaintiff children represented by PLEAS, as well as the three individual children, receive allegedly medically necessary services, funded by Medicaid, from Step By Step Academy (SBSA).  SBSA is a nationally accredited and state certified community mental health agency that provides mental health services to children with autism.

Autism is a "complex neurodevelopmental disability that generally appears during the first three years of life which impacts the normal development of the brain, resulting in impairments of social interaction, verbal and non-verbal communication, leisure and play activities, and learning." (Complaint at ¶ 53). It is a diagnosis found in the *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed., 1994 (DSM IV). See, Declaration of James A. Mulick, Ph.D at ¶ 17.  In recent years, research has demonstrated that by providing a child with autism appropriate services and supports, significant gains in most life areas can be achieved and some children can go on to live and work independently as adults. See Id. at ¶ 11.  For an autistic child, "the best treatment plan will include ABA [applied behavioral analysis], the only treatment approach confirmed as effective by a comprehensive evaluation of all proposed therapies in a well known government sponsored review process." Id. at ¶ 20; see also, Id. at ¶ 21 (ABA therapy is "a highly effective form of behavioral treatment in virtually all cases").  ABA therapy uses a one-on-one teaching approach that relies on reinforced practice of various skills, with the goal of getting the child as close to typical developmental functioning as possible. Id. at ¶ 21.  Research has also shown ABA

2

therapy for autistic children is most effective when it is provided 30-40 hours per week in an intensive one-on-one setting.  Declaration of Beth Ann Rosner, Ph.D, at ¶ 3. .  ABA programs are usually conducted under the supervision of a behavioral psychologist.  Mulick Decl. at ¶ 25.  Intensive behavioral interventions for autistic children "represent the treatment modality that provides the maximum reduction of physical and mental disability to achieve their best possible functional level."Id. at ¶ 35.

Plaintiff children have been receiving ABA therapy, along with other services, at SBSA.  SBSA provides a full-day year round treatment program that offers services to children in one-on-one and small group settings. See, Rosner Decl. at ¶ 3.  Treatment offered at SBSA includes the development of language, self-help, socialization, gross and fine motor skills, cognition, and early learning skills. Id.  Treatment also focuses on decreasing the severity and frequency of behavior problems that interfere with learning and social adaption in autistic children. Id.  Children are generally referred to SBSA by licensed health care providers or are evaluated at SBSA by a licensed psychologist.  For instance, children evaluated at Nationwide Children's Hospital Developmental Evaluation Program are often referred to SBSA because "SBSA can offer center based behavioral intervention and because they offer a high quality of service." Mulick Decl. at ¶ 34.

Plaintiffs have also provided evidence indicating that plaintiff children have benefitted from the services received at SBSA.  Individual Plaintiff , X.C., is a six year old boy diagnosed with autism disorder and attention deficit hyperactivity disorder (ADHD). See, Declaration of A.C. at ¶ 2.  X.C. began receiving services at SBSA in January of 2007.  Upon enrolling in SBSA, X.C. was in constant motion, any change in

3

routine led to tantrums (crying yelling, screaming and banging his head), he could not be taken out in public due to his unruly behavior, he was withdrawn and did not acknowledge others when spoken to, he ate a very limited diet, and he ate non-food items whenever he could. See, Rosner Decl. at ¶16. Due to his behavioral issues, X.C. receives one-to-one sessions in a room separate from other children. A.C. Decl. at ¶15. Since attending SBSA, X.C.'s diet has improved, he is able to communicate by tapping his mother's shoulder for attention and using "I want," "I have," and "I am not" sentences. A.C. Decl. at ¶¶15, 16. X.C has tried placements with other providers with no success. Id. at ¶ 19.

PLEAS member, J.L. is autistic and has attended SBSA since April of 2006. (Plaintiff's Ex. 9). When he started SBSA, J.L. was non-verbal, had little receptive or expressive language, and severely delayed gross motor skills. Id. In addition, J.L. was exhibiting rumination (the regurgitation of previously swallowed food and liquid) at a rate of as much as 600 times per day. After starting services at SBSA, J.L.'s communication skills have increased (although they remain at the one year old level), he now responds to his name, listens to instructions and smiles when smiled at. Id. The most notable improvement has been the reduction in rumination. J.L. now typically ruminates less than five times per day. Id. Other plaintiff children have experienced similar improvement.

Defendant Helen Jones-Kelley is the Director of ODJFS, which is the agency responsible for the administration of the Medicaid program in Ohio. As Director, Jones-Kelley is responsible for ensuring that Ohio's Medicaid program complies with federal Medicaid statutes and regulations. Jones-Kelley is also responsible for ensuring that

4

other state and county agencies and subdivisions which provide services funded by Medicaid comply with applicable federal laws. Defendant Sandra Stephenson is the Director of ODMH. As Director, Stephenson is responsible for adopting standards for services provided by community mental health facilities. ODJFS and ODMH are parties to an interagency agreement to provide behavioral health services to people who are eligible for Ohio Medicaid benefits. Defendant Kerry Weems, is the Acting Administrator of the Federal Centers for Medicare and Medicaid Services (CMS).[2]

In October of 2005, CMS sent a letter to Barbara Riley, then-Director of ODJFS, concerning Ohio's proposed Medicaid State plan amendments. See, Defendant's Ex. M. The letter indicated that "habilitation services" are not included in the definition of "medical assistance" and therefore, the proposed plan to cover such services under the "rehabilitative" services category could not be approved. The letter does not define "habilitation services." In August of 2007, CMS filed a proposed rule that would limit the services covered under the "rehabilitative" services category. Congress has placed a moratorium on these and other proposed restrictions on Medicaid Law.

Not long after CMS proposed rules that would curtail coverage of services under Medicaid, ODJFS proposed its own new Administrative Rules. The proposed rules change the definition of "rehabilitative services" and effectively limit the services that can be provided under Medicaid. At present, Ohio's state plan covers certain community mental health services, so long as those services are "rendered by eligible medicaid

---

[2]     On June 20, 2008, the Court required joinder of the CMS and Plaintiffs amended their complaint accordingly. Defendant CMS has been notified of the suit against it and was represented by counsel at the TRO hearing on June 27, 2008.

providers." Ohio Admin. Code 5101:3-27-02(A). Under this section, mental health services include community psychiatric supportive treatment (CPST) services. See, Ohio Admin. Code 5101:3-27-02(A)(6).  The new version of 5101:3-27-02,  effective July 1, 2008, is amended to clarify that only "rehabilitative" mental health services will be reimbursed by Medicaid. See, Ohio Admin. Code 5101:3-27-02(A), eff. 7/1/08. "Rehabilitative services" are defined in the amended version as providing for the "maximum reduction of mental illness and are intended to restore an individual to the best possible functional level." Id. CSPT services will continue to be covered by Medicaid subject to certain limitations. Ohio Admin Code 5101:3-27-02(A)(6), eff. 7/1/08.  The changes to the rule reflect a much more narrow definition of "rehabilitative" than that found in the Federal Medicaid Act, which defines "rehabilitative" as "any medical or remedial services recommended by a physician or other licensed practitioner of the healing arts, within the scope of his practice under State law, for maximum reduction of physical or mental disability and restoration of a recipient to his best possible functional level."  See 42 C.F.R. § 440.130(d). The federal regulations do not require that the rehabilitative services reduce "mental illness."

The second proposed change is to Ohio Admin. Code 5122-29-17, which governs CSPT services.  The current version, in effect until July 1, 2008, provides that CSPT services are  "an array of services delivered by community based, mobile individuals or multidisciplinary teams of professionals and trained others [that] address the individualized mental health needs of the client." Ohio Admin. Code 5122-29-17(A). Under the version currently in effect, CPST services "should be focused on the individual's ability to succeed in the community; to identify and access needed services;

6

and to show improvement in school, work and family and integration and contributions within the community." Id.   The amended version of Ohio Admin Code 5122-29-17, eff. 7/1/08, specifies that CSPT service is a "rehabilitative service intended to maximize the reduction of symptoms of mental illness in order to restore the individual's functioning to the highest level possible."  The new rule restricts coverage of rehabilitative services to individuals with "mental illness," thereby effectively excluding other physical and mental disabilities from coverage.

These proposed new administrative rules were apparently in response to Ohio's concern that it was going to lose federal funding for services it was currently providing. Ohio's concern was confirmed in a letter dated March 21, 2008 from CMS.  In this letter, CMS informs ODJFS Director Jones-Kelley that CMS "generally views treatment for autism as habilitative rather than rehabilitative -- as such, the CPST claims by Step by Step may not comply with Ohio's State Plan."  See, Def. Ex. G. Notably, the March 21, 2008 letter uses the definition of CPST as set forth in the amended version of the Ohio Administrative Code.  It is clear to the Court that the State Defendants' decision to change the Administrative Rules was in an effort to avoid having to pay for certain services under its Medicaid plan.

## II.    Medicaid Overview

Medicaid, authorized by Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., is a joint federal and state program designed to provide "medical assistance" to needy individuals. Its administration is entrusted to the Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services (CMS). Ark. HHS v. Ahlborn, 547 U.S. 268, 275 (2006).  The

Medicaid program is subsidized by the federal government, but is administered by the states. Catanzano by Catanzano v. Wing, 103 F.3d 223, 225 (2nd Cir. 1996). While participation in the program is voluntary, once a state chooses to participate, it must comply with the requirements of the Medicaid Act and its regulations. Harris v. McRae, 448 U.S. 297, 300 (1980)(although participation is optional, once a state elects to participate, it must comply with the requirements of Title XIX);  State of Louisiana v. HHS, 905 F.2d 877, 878 (5th Cir. 1990)(although states have considerable discretion to design and operate their individual programs, they must maintain their plans in compliance with federal requirements in order to ensure federal funding).

Participating states must submit a "state plan" to CMS for approval before that state may receive Medicaid funds. See 42 U.S.C. §§ 1396a(a) & (b); see also, Catanzano, 103 F.3d at 225. The state plan initially must be approved by the Secretary of Health and Human Services. 42 U.S.C. § 1316(a)(1). Thereafter, a state that seeks to change its state plan may submit an amendment to CMS for approval. See 42 C.F.R. § 430.14-430.15; La. Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs., 346 F.3d 571, 572 (5th Cir. 2003) (stating that 42 C.F.R. § 430.14-430.15 records the Secretary's delegation of authority for approving state plan amendments to CMS). Ohio has an approved state plan. Ohio Dep't of Mental Retardation & Developmental Disabilities v. U.S. Dep't. of Health and Human Services, Health Care Financing Admin.,761 F.2d, 1187,1188 (6th Cir. 1985).  Ohio's statutory scheme for the provision of Medicaid is found at Ohio Rev. Code. § 5111.01 et seq. and its regulations found at Ohio Admin. Code Chapter 5101.

Compliance with federal Medicaid law requires a participating state to provide medical assistance to certain classes of people, including disabled children. 42 U.S.C. §1396a(a)(10)(A).  A state plan must provide a range of mandatory medical services to Medicaid recipients. 42 U.S.C. §1396d(a)(1)-(28) (setting forth the various required services); see also S. D. v. Hood, No. 02-2164 Section "N", 2002 U.S. Dist. LEXIS 23535 (E.D. La., Dec. 5, 2002)(federal law mandates that the states provide a range of medical services). While a state has discretion in determining which medical services, beyond the mandatory seven, it will cover for adults, states "are bound, when it is medically necessary, to make available to Medicaid-eligible children all of the twenty-eight types of care and services included as part of the definition of medical assistance in the Act." Rosie D. v. Romney, 410 F. Supp. 2d 18, 25 (D. Mass, 2006).   Moreover, a state may not ignore the Act's requirements "in order to suit state budgetary needs." Illinois Hospital Asso. v. Illinois Dep't of Public Aid, 576 F. Supp. 360, 371 (N.D. Ill 1983).

Plaintiffs assert that the State of Ohio, in enacting proposed changes to the Ohio Administrative Code sections governing the implementation of Ohio's Medicaid program, have violated federal Medicaid law.  Specifically, Plaintiffs challenge the State Defendants' compliance with the Federal "early and periodic, screening, diagnostic, and treatment services" (EPSDT).

EPSDT is a mandatory medical service that must be provided by a State that has chosen to participate in the federal Medicaid program.  42 U.S.C. §§ 1396a (a)(43). EPSDT is defined at 42 U.S.C. §1396d(r) and includes the following specific services: screening services to determine the existence of certain physical or mental illnesses or

conditions (§1396d(r)(1)(A)(ii)), vision services (§1396d(r)(2)), dental services

(§1396d(r) (3)), and hearing services (§1396d(r) (4)).  EPSDT also includes:

> such other necessary healthcare, diagnostic services, treatment, and
> other measures described in section 1905(a) [subsec. (a) of this section]
> to correct or ameliorate defects and physical and mental illnesses and
> conditions discovered by the screening services, whether or not such
> services are covered under the State plan.

42 U.S.C. §1396d(r) (5); <u>see also</u> 42 C.F.R. 441.50 (further state plan requirements for

EPSDT).  42 U.S.C. 1396d(a)(1) through (28) provide the necessary services that must

be provided to eligible children under the "EPSDT umbrella." These services include

"EPSDT services" ((a)(4)(B)). Of importance to this case is the following mandate, found

at subsection (a)(13), which states that a state plan must provide for:

> other diagnostic, screening, preventative and rehabilitative services,
> including any medical or remedial services (provided in a facility, home or
> other setting) recommended by a physician or other licensed practitioner
> of the healing arts within the scope of their practice under State law, for
> the maximum reduction of physical or mental disability and restoration of
> an individual to the best possible functional level.

This section reflects the extremely broad EPSDT obligation. <u>See</u> <u>Katie A. v. Los</u>

<u>Angeles County</u>, 481 F.3d1150, 1154 (9th Cir. 2007) (citing CMS' description of EPSDT

as a "comprehensive child health program of prevention and treatment"); <u>Rosie D. v.</u>

<u>Romney</u>, 410 F. Supp. 2d 18, 25 (D. Mass 2006) ("as broad as the overall Medicaid

umbrella is generally, the initiatives aimed at children are far more expansive").  The

only limit on EPSDT services is that they be "medically necessary." <u>Romney</u>, 410 F.

Supp.  2d at 26; <u>Collins v. Hamilton</u>, 349 F. 3d 371, 376 n. 8 (7th Cir. 2003)( in the

context of individuals under the age of twenty-one subject to EPSDT services, a state's

discretion to exclude services deemed 'medically necessary' by an EPSDT provider has been circumscribed by the express mandate of the statute").

Ohio's EPSDT plan is referred to as "Healthchek" and is codified at Ohio Admin. Code 5101:3-14-01 -- 5101:3-14-22. The purpose of Healthchek is to "maintain health by providing early intervention to discover and treat health problems." Ohio Admin. Code 5101:3-14-01(A). In Ohio, ESPDT services are covered by Medicaid "when the services are medically necessary, as defined in rule 5101:3-1-01 of the Administrative Code, to treat or ameliorate a defect, physical or mental illness, or condition." Ohio Admin. Code 5101:3-14-05(E). The term "medically necessary" is defined as:

> services that are necessary for the diagnosis or treatment of disease, illness, or injury and without which the patient can be expected to suffer prolonged, increased or new morbidity, impairment of function, dysfunction of a body organ or part, or significant pain and discomfort.

Ohio Admin. Code 5101:3-1-01 (A). In addition, a medically necessary service must: 1) meet generally accepted standards of medical practice (5101:3-1-01(A)(1)); 2) be appropriate to the illness or injury for which it is performed as to type of service and expected outcome (5101:3-1-01(A)(2)); 3) be appropriate to the intensity of service and level of setting (5101:3-1-01(A)(3)); 4) provide unique, essential, and appropriate information when used for diagnostic purposes (5101:3-1-01(A)(4; 5) be the lowest cost alternative that effectively addresses and treats the medical problem(5101:3-1-01(A)(5)); and 6) meet general principles regarding reimbursement for medicaid covered services found in rule 5101:3-1-02 of the Administrative Code (5101:3-1-01(A)(6)).

Ohio's state plan specifically identifies certain services which are covered, however, the fact that a state plan does not mention a particular service does not mean it is not a covered EPSDT service. See 42 U.S.C. § 1396d(r)(5) (setting forth EPSDT requirements and specifically stating that services are required, "whether or not such services are covered under the State plan"); see also, Pediatric Speciality Care, Inc. v. Ark. Dep't of Human Servs., 293 F.3d 472, 480 (8th Cir. 2002) (the state plan need not specifically list every treatment service conceivably available under the EPSDT mandate).

## III. LEGAL STANDARD

Fed. R. Civ. P 65 authorizes the Court to grant a temporary restraining order. When deciding whether to grant preliminary injunctive relief, the Court considers four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief. See Leary v. Daeschner, 228 F. 3d 729, 236 (6th Cir. 2000). A district court must make specific findings concerning each of these factors, unless analysis of fewer factors is dispositive of the issue. Six Clinics Holding Corp., II v. Cafcomp Systems Inc., 119 F.3d 393, 399 (6th Cir. 1997). However, not all the factors need be fully established for a temporary restraining order or injunction to be proper. Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997). While none of the factors are given controlling weight, a preliminary injunction should not be issued where there is no likelihood of success [*5] on the merits. Michigan State AFL-CIO, 103 F.3d at 1249.

12

**IV. ANALYSIS**

    **A.    Whether the Court must abstain from deciding the Plaintiffs' motion based on either the <u>Burford</u> abstention or the doctrine of primary jurisdiction.**

Defendants assert that the must Court refrain from deciding the case pursuant to the <u>Burford</u>  abstention and/or the doctrine of primary jurisdiction because the claims in the Complaint challenge Ohio Administrative Rules and state law. Defendants further assert that abstention is proper because resolution of the claims may have budgetary implications.

<u>Burford</u> abstention stems from the case of <u>Burford v Sun Oil Co.</u>, 319 US 315, (1943), in which the Supreme Court held that a federal court sitting in equity may, under certain circumstances, properly decline to exercise its jurisdiction over an action challenging the validity of a state administrative order. <u>New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350</u> (1989) (explaining the holding in <u>Burford</u>). The Burford doctrine provides that, where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies in two circumstances: 1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar;  or 2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.  <u>Adrian Energy Assocs v. Mich. PSC</u>, 481 F. 3d 414, 423 (6th Cir. 2007 ); <u>see</u> <u>also</u>, <u>Value Behavioral Health v. Ohio Dep't of Mental Health</u>, 966 F. Supp. 557, 572 (<u>Burford </u>doctrine "applies if a federal court's assertion of jurisdiction

would interfere with a state agency, necessitate the resolution of state law issues, and disrupt state efforts to establish a coherent policy as to a matter of public concern").  In the context of cases involving state administrative schemes, the <u>Burford</u> abstention and primary jurisdiction doctrines "are different labels for the same thing." <u>College Park Holdings v. Racetrac Petroleum</u>, 239 F. Supp. 2d 1322 (N.D. Ga, 2002).

Courts should be reluctant to invoke both the <u>Burford</u> abstention and the doctrine of primary jurisdiction.  <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800, 813, (1976) (Burford doctrine "represents an extraordinary and narrow exception to the duty of the district court to adjudicate a controversy that is properly before it"); <u>College Park Holdings v. Racetrac Petroleum</u>, 239 F. Supp. 2d 1322 (N.D. Ga, 2002) (courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants).

Defendants argue that abstention is proper because the case involves "complex state law issues" that relate to Ohio's Medicaid program and because the Court's decision could have significant budgetary implications. The Defendants also assert that if the Court abstains from hearing the case, the Plaintiffs can still obtain the services they need through state-law mechanisms, including the prior authorization process and the state administrative hearing process.  Defendants do not cite any case law in support of their argument that this case justifies invocation of an extraordinary and narrow exception to the court's duty to adjudicate cases. Arguments for <u>Burford</u> abstention have been considered in similar cases and denied.

In <u>Moore v. Meadows</u>, 2007 U.S. Dist. LEXIS 47087, (N.D. Ga 2007),  the Plaintiff was a disabled minor receiving skilled nursing care under the Federal EPSDT

14

mandate.  She filed a section 1983 action seeking injunctive and declaratory relief that the State Medicaid plan was not in compliance with the federal EPSDT mandate. The Defendant, Georgia Department of Community Health, urged the court to abstain pursuant to Burford on the grounds that the Plaintiffs claims arose from a state regulatory scheme affecting matters of importance to the administration of Georgia's Medicaid program. Id. at *7.  The Court declined to abstain, finding that the claims were not of an essentially local concern, but involved rather "federal funds and federal regulation in an area in which the federal government has taken a keen interest." Id (citing Meachem v. Wing, 77 F. Supp. 2d 431, 443 (S.D. N.Y. 1999); see also Arkansas Medical Soc., Inc. v. Reynolds, 6 F.3d 519, 529 (8th Cir. 1993) (federal Medicaid laws are "routinely interpreted by federal courts and no specialized knowledge of state law is required."); Meachem, 77 F. Supp. 2d at 443 (plaintiffs' claims for various social services, including Medicaid , did not "implicate not a complex state regulatory scheme, but an important federal interest embodied in the Medicaid Act.").

Furthermore, the fact that the claims may impact the State's budget, does not mandate abstention. Ohio State Pharmaceutical Asso. v. Creasy, 587 F. Supp. 698 (S.D. Ohio 1984) (even though the State may have a substantial interest in the management of its budget, there is no risk of an inconsistent application of state law or policy presented by the case at bar. The regulations which must be interpreted to resolve this matter are federal; the uniformity of application or interpretation of these regulations is a federal concern). Finally, the fact that there is a deferral letter from CMS regarding services at SBSA does not mandate that the Court wait for the administrative process to play out.  The primary issue before the Court is whether the State's proposed

15

rules violate Medicaid law. Accordingly, invocation of the <u>Burford</u> abstention or the

doctrine of primary jurisdiction is not proper in this case.

**B.     Civ. R. P. 65**

**1.     Whether the movant has a strong likelihood of success on the merits**.

As explained in detail in section II, the federal EPSDT mandate requires a state

to provide EPSDT services.  42 U.S.C. §1396a(a)(43) and §1396d(a)(4)(B). These

services are defined as including screening services, vision services, dental services,

hearing services, and

> (5)     such other necessary health care, diagnostic services,  treatment and other measures described in section 1905(a) [subsec. (a) of this section] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

42. U.S.C. §1396d(a)(1) through (28) provide the necessary services that must be

provided to eligible children. Subsection (a)(13), states that a state plan must provide

for:

> other diagnostic, screening, preventative and rehabilitative services, including any medical or remedial services (provided in a facility, home or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level.

This provision has been interpreted by other courts to mean that if a "licensed clinician

finds a particular service to be medically necessary to help a child improve his or her

functional level, this service must be paid for by a state's Medicaid plan pursuant to the

EPSDT mandate." <u>Romney</u>, 410 F. Supp. 2d  at 26; <u>see</u> <u>also</u>, <u>Collins v. Hamilton</u>, 349

F. 3d 371, 375 (7th Cir. 2003) (if a competent medical service provider determines that

specific type of care or service is medically necessary, the state may not substitute a

different service); <u>John B. ex rel L.A. v. Menke</u> 176 F. Supp. 2d 786, 800 (M.D. Tenn.

2001) (state is bound by federal law to provide medically necessary services).   Plaintiffs

assert that section (a)(13), read in conjunction with the ESPDT mandate of (a)(43), as

defined in d(r), requires Ohio to cover services rendered at SBSA that are medically

necessary.

Defendants do not dispute that by participating in Medicaid, Ohio is required to

comply with the federal Medicaid laws. Rather, Defendants assert that they are not

allowed to cover the services rendered at SBSA because they are "habilitative" rather

than "rehabilitative." The defendants base their position on the deferral letter from CMS

to ODJFS in which CMS states that "CMS generally views treatment for autism as

habilitative rather than rehabilitative."  (Def. Ex. G).

The term "rehabilitative services" is defined in the regulations implementing the

federal Medicaid law as:

> Rehabilitative services," except as otherwise provided under this subpart,
> includes any medical or remedial services recommended by a physician or
> other licensed practitioner of the healing arts, within the scope of his
> practice under State law, for maximum reduction of physical or mental
> disability and restoration of a recipient to his best possible functional level.

42 C.F.R. § 440.130(d).  Habilitation services are defined in only one section of the

Medicaid Act. 42 U.S.C. 1396n(c)(5)(A). This section provides that, for purposes of

paragraph (c)(4)(B) (dealing with state waiver programs for the purpose of preventing

institutionalization ), the term "habilitation services":

> means services designed to assist individuals in acquiring, retaining, and
> improving the self-help, socialization, and adaptive skills necessary to reside

successfully in home and   community based settings.

Unlike the definition of "rehabilitative services", the definition of "habilitation services" does not contain the requirement that the services be "medical or remedial" and "recommended by a physician or other licensed practioner of the healing arts." Moreover, habiliative services are not services which are recommended for the "maximum reduction of physical or mental disability and restoration of a recipient to his best possible functional level." What truly differentiates "habilitative" and "rehabilitative" services is the "medical necessity" of those services. Ohio, Dep't of Mental Retardation & Developmental Disabilities v. U.S. Dept. of Health and Human Services, 761 F.2d 1187 (6th Cir. 1985) ("Putting aside the argument over "habilitative" and "rehabilitative," Ohio must be given an opportunity to demonstrate that the services which it proposes to provide at habilitation centers fall within "medical assistance" as defined in Title XIX.").

Defendants assert that the CPST services provided at SBSA are not covered by any of the sections listed in (a) (1) through (28), including (a)(13).  Plaintiffs argue that the CPST services fit within the meaning of "medical or remedial services" in (a)(13). Defendants counter that the phrase "including any medical or remedial services" modifies only the word "rehabilitative," thus requiring that covered medical services under (a)(13) be "rehabilitative."  Defendants then return to their position that the services rendered at SBSA are "habilitative" and therefore not covered by Medicaid, unless rendered pursuant to a waiver. See  42 U.S.C §1396n. Defendant concludes that the services at SBSA are not generally "habilitative" because the services are not "restoring" any skills that the child previously had.  Taken to its logical conclusion, such an restrictive interpretation of "rehabilitative" would mean that no child who is born with

18

a disability, could ever receive rehabilitative services. This does not comport with the broad coverage afforded under the EPSDT mandate.

Furthermore, Defendants have cited no authority for their restrictive interpretation that "remedial and medical services" are covered only if they are "rehabilitative." Though Defendants claim that CMS has adopted this interpretation, they have not cited to any agency action that is entitled to Chevron deference. See, Chevron USA v. Natural Resources Defense Council, 467 U.S. 837 (1984); U.S. v. Mead Corp., 533 U.S. 218, 227-231 (2001)(discussing the application of Chevron). Given the expansive requirements of the EPSDT mandate, the Court finds no basis for such a restrictive reading of the statute.

Moreover, section (a)(13) also requires that State's provide "preventive services" which are defined as: "services provided by a physician or other licensed practitioner of the healing arts within the scope of his practice under State law to: 1) prevent disease, disability, and other health conditions or their progression; 2) prolong life; and 3) promote physical and mental health and efficiency.  Thus, the services provided at SBSA may well be "preventative" as well as "rehabilitative."

The Court's conclusion that the services required by the EPSDT mandate are more broad than Defendants would suggest, is supported by case law. In Rosie D. v. Romney, 410 F. Supp. 2d 18 (D. Mass 2006) the Court found that section d(a)(13) does not contain a requirement that the services be "rehabilitative." Rather, in that case, the Court found that "if a licensed clinician finds a particular service to be medically necessary to help a child improve his or her functional level, this service must be paid for by a state's Medicaid plan pursuant to the EPSDT mandate."  The Court used the

word "improve" and not "restore" in concluding that the services were necessary.  In

S.D. v. Hood, 391 F.3d 581 (5th Cir. 2004) the Court was also considering the EPSDT

provisions of the federal Medicaid law and stated "every Circuit which has examined the

scope of the EPSDT program has recognized that states must cover every type of

health care or service necessary for EPSDT corrective or ameliorative purposes that is

allowable under § 1396d(a)."  Again, there is no requirement that the services be

"rehabilitative" but only that they ameliorate or correct a condition. In Pediatric Specialty

Care Inc.v. Ark. Dept. of Human Services, 443 F. 3d 1005 (8th Cir. 2006), the Eighth

Circuit read 42 U.S.C. 1396d(a)(13) as requiring the State to provide early intervention

behavioral treatment to children under the EPSDT mandate.  The district court

concluded that such treatment was rehabilitative, even though it applied to young

children who presumably were not being "restored" to a prior ability.

Plaintiffs provided sufficient evidence that ABA therapy, when recommended by

a licensed practioner of the healing arts, is a medically necessary service which

provides the maximum reduction of a mental or physical disability.  Because the

proposed administrative rules will effectively cut off funding for medically necessary

services, Plaintiffs have established a likelihood of success on the merits.

### 2.      Whether Plaintiffs will suffer irreparable injury.

Plaintiffs have also established that if the new rules are made effective, they will

suffer irreparable injury.  If the Plaintiff children are no longer able to receive the

medically recommended 35-40 hours of ABA therapy per week, there is sufficient

evidence that the children will experience regression.  For children like J.L., whose

rumination went from less than five times per day to 34 times per day when his behavior plan was stopped for a mere two days, the injury is significant. See, Plaintiff's Ex. 9; see also, Decl. of A.C. at ¶ 17 (during breaks when X.C. does not receive treatment at SBSA, his behaviors worsen and his skills regress); Decl. of K.G. (during breaks when W.G. does not receive his services at SBSA, he suffers regression). Plaintiffs' provided the opinion of a licensed medical provider who concluded, in her professional judgment and to a reasonable degree of certainty, that if services are stopped, the Plaintiff children will suffer irreparable injury. See, Rosner Decl. at ¶ 7.

Defendants assert that Plaintiffs will not suffer because if the services provided at SBSA are medically necessary, they may still be covered under other sections of the Medicaid Act. This argument ignores the fact that the services Plaintiff children need are not provided at the same intensive level elsewhere and for some children SBSA may offer the only site where they can receive such services. SBSA is certified as a community mental health provider offering CPST services. The proposed amendments specifically target the provision of CPST services to these children. The fact that the proposed amendments will no doubt affect the provision of services to these children is evidenced by the State's own attempts to find other arrangements for the children once the new rules are made effective. See, Def. Exs. W, Y, Z, and AA.

 

**3. Whether issuance of preliminary injunctive relief would cause substantial harm to others.**

The evidence is clear that the State adopted the new rules to avoid having to pay for services which it was concerned would not be reimbursed by CMS.  Several of the State's exhibits were financial in nature, showing the cost of services provided at SBSA. In enjoining the State from enforcing the new rules, the Court is concluding that the Plaintiffs have a strong likelihood of establishing that ABA therapy is a medically necessary service that must be covered by Medicaid.  Once a state has voluntarily elected to participate in the Medicaid program, it must comply with all federal Medicaid standards. Accordingly, " no state may characterize its duty to comply with the requirements of an elective program such as Medicaid as constituting a hardship to its citizens."  <u>Ilinois Hospital Asso. v. Illinois Dep't of Public Aid</u>, 576 F. Supp. 360, 371.  If the services are medically necessary, CMS must cover the cost of those services. Thus, by enjoining the State, the Court is not requiring that the State pay for services which will not be reimbursed by CMS. The balance of harm sure to be suffered by the Plaintiffs outweighs and potential harm suffered by the Defendants.

### 4.  Whether the public interest would be served by issuance of a preliminary injunctive relief.

Congress mandated that the ESPDT services be provided to eligible children in the State of Ohio.  Both the federal and state governments recognize  that the purpose of EPSDT is to prevent or correct conditions at an earlier time so that the costs are not conveyed into adulthood.  Early, and effective, treatment of children with autism has been shown to provide significant improvement, including the return of those children to the general community. <u>See</u>, Mulick Decl. at ¶ 11. The public benefits from the treatment of children with medical conditions. Although the cost of providing care to

autistic children appears daunting, the potential that such care will have to be continued throughout adulthood poses a potentially larger economic burden.  See, Michelle LeMarche Decl. at ¶ A (studies show a savings of $1,000,000 per child over the child's lifetime by receiving necessary early intervention).

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' request for injunctive relief.  The Defendants are therefore ORDERED to refrain from implementing Ohio Admin Code. 5101:3-27-02 and 5122-29-17.  In so ruling, the Court is not deciding that all of the services provided by SBSA are medically necessary nor that the cost of treatment as billed by SBSA is reasonable. Rather, the Court is simply holding that the Plaintiffs have a reasonable chance of being successful in establishing that ABA services are covered by Medicaid and that the amendments to the Ohio Administrative Code violate the federal Medicaid Act.

IT IS SO ORDERED.

S/ James L. Graham
James L. Graham
UNITED STATES DISTRICT JUDGE


Date: June 30, 2008